David I. Swan (VSB No. 75632)
1750 Tysons Boulevard
Suite 1800
Tysons Corner, VA 22102-4215
Telephone: (703) 712-5365
Facsimile: (703) 712-5246

*Proposed Counsel for Global Computer*
*Enterprises, Inc. as Debtor and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| **In re:** | ) | |
| | ) | |
| **GLOBAL COMPUTER ENTERPRISES,** | ) | **Case No. 14-13290-RGM** |
| **INC.,**[1] | ) | |
| | ) | **Chapter 11** |
| **Debtor.** | ) | |
| | ) | |

**DEBTOR'S MOTION PURSUANT TO SECTIONS 105(a), 363, AND 365 OF
THE BANKRUPTCY CODE, BANKRUPTCY RULES 2002, 6004, 6006, AND 9014,
AND LOCAL RULES 2002-1 AND 6004-2, REQUESTING ENTRY OF AN ORDER
APPROVING THE SALE OF ASSETS, INCLUDING THE ASSUMPTION AND
ASSIGNMENT OF CONTRACTS, FREE AND CLEAR
OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS AND (II)
WAIVING THE STAY IMPOSED BY BANKRUPTCY RULES 6004(H) AND 6006(D)**

Global Computer Enterprises, Inc. as a debtor and debtor in possession (the "Debtor"), files

this *Motion Pursuant to Sections 105(a), 363, and 365 of the Bankruptcy Code, Bankruptcy*

*Rules 2002, 6004, 6006, and 9014, and Local Rules 2002-1 and 6004-2, Requesting Entry of an*

*Order (I) Approving the Sale of Assets, Including the Assumption and Assignment of*

*Contracts, Free and Clear of All Liens, Claims, and Interests and (II) Waiving the Stay*

*Imposed by Bankruptcy Rules 6004(h) and 6006(d)* (the "Motion"). In support of this Motion,

Debtor respectfully shows as follows

---

[1]     The last four digits of the Debtor's taxpayer identification number are 1136. The mailing address for the
Debtor is 10780 Parkridge Boulevard, Suite 300, Reston, Virginia 20191.

## I.    JURISDICTION AND VENUE

1.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

2 .     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

3 .     The statutory predicates for the relief requested herein are sections 105(a), 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1 and 6004-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Eastern District of Virginia (the "Local Bankruptcy Rules").

## II.    GENERAL BACKGROUND

4.     On September 4, 21014 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

5.     The Debtor continues to operate its businesses and manage its estate as a debtor in possession as authorized by sections 1107(a) and 1108 of the Bankruptcy Code.

6.     The events leading up to the Petition Date and the facts and circumstances supporting the Debtor's petition are set forth in the *Declaration of Michael Freeman in Support of First Day Pleadings* (the "First Day Declaration") filed contemporaneously herewith. Additional facts and circumstances supporting this Motion are set forth in the Affidavit of Charles C. Reardon (the "Sale Affidavit") attached hereto as Exhibit A.

## A. **Brief Overview of the Company's Operations.**

7.        GCE, a Maryland corporation with its primary operations in Reston, Virginia, is a

leading cloud-based "software as a service" provider, commonly referred to as a "SAAS" in the

industry, offering financial management solutions (collectively, the "FMS") primarily to

executive departments of the federal government and independent federal government agencies,

including the United States Department of Labor ("DOL") and the Equal Employment

Opportunity Commission ("EEOC"). Through the FMS, GCE provides technical and functional

enterprise system solutions, implementation, transaction processing, financial reporting, and

customer support services for federal agencies seeking compliance and audit support for their

financial, accounting, procurement, budget, travel, and asset management needs.

8.        GCE's FMS is cloud-based and delivered as a service, which enables customers

to avoid the cost of maintaining and managing an on premise IT infrastructure. GCE's

customers have unlimited, secure access to GCE's FMS, which are fully built out and are

powered by Oracle eBusiness Suite. The FMS is composed of highly customized, commercially-

based intellectual property ("IP") software including customized hardware and commercially

available third-party software. Within the market, the FMS is referred to as a commercial

shared service provider or "CSSP".

9.        As part of its comprehensive FMS, GCE transitions customers' operations and

users quickly and easily to GCE's cloud and provides a customer care team to meet each

customer's specific technology and financial needs. GCE manages the entire IT function for its

customers and automatically performs updates to ensure its customers' systems remain state-of-

the-art. This approach enables customers to focus on managing their businesses and day-to-day

financial and accounting operations. GCE continually ensures that the system and service

offerings evolve with the changing requirements, regulations, standards, and technologies in the markets in which it operates. Also, GCE offers a flexible pricing model and a full set of services so that customers pay for only those services that they utilize.

10.    Importantly, given the increasing threat of data breaches and ever-evolving cybersecurity issues, GCE is committed to maintaining the integrity, confidentiality, and availability of customers' sensitive financial data. To that end, GCE utilizes a comprehensive, four-pronged data security program based upon NIST standards.[2] As part of its approach, GCE's dedicated security team continuously monitors GCE's networks and systems and performs life-cycle risk activities to deter and correct system vulnerabilities.

11.    Nearly 100% of GCE's revenues are derived from its relationship with the DOL and the EEOC. For example, DOL utilizes the FMS to standardize and process over $170 billion worth of transactions a year for its fourteen agencies, eight finance centers, and more than 1,900 users nationwide.

12.    GCE maintains an authority to operate (an "ATO") with DOL and the EEOC, effectively positioning the company as an outsourced commercial shared service provider (a "CSSP"). Both ATOs were renewed in September 2012 for a three-year term. DOL and EEOC awarded the ATOs to GCE as the prime contractor through a full and open procurement basis. The ATOs are essential to GCE's ability to work with the Federal government and related agencies.

**B.   Events Leading to the Commencement of this Case**

---

[2]    NIST, or the National Institute of Standards and Technology, is the federal technology agency that works with various industries to develop and apply technology, measurements, and standards. Recently, under Presidential mandate, the Administration charged NIST with the task of working with stakeholders in the cybersecurity arena to develop and implement a framework for reducing cyber risks to critical government and private infrastructure.

13.    In 2013, GCE's facilities were raided by the FBI, which was followed by an investigation by the Department of Justice related to GCE's alleged violation and use of foreign nationals performing under contracts where prohibited (the "DOJ Investigation"). GCE opposes any civil or criminal penalties that the DOJ may pursue, but GCE has been cooperating with the DOJ Investigation and engaging in efforts to resolve the DOJ's contingent claims.

14.    Unfortunately, the DOJ Investigation, and the distractions and costs suffered by GCE as a result thereof, drained GCE's management, business operations, and ultimately, cash. GCE was not only forced to defend itself, but also undertook the support of the costs of defending individual members of management. GCE incurred approximately $4.67 million in legal bills and related expenses resulting from the DOJ Investigation, quickly exhausting its D&O insurance policy, and eliminating all profitability and liquidity of the Debtor.

15.    In January 2014, GCE hired Michael Freeman to address the various issues with GCE's business operations. Mr. Freeman quickly realized that GCE did not have enough cash to pay its mounting legal bills and maintain business operations, including payroll. In his capacity as interim chief operating officer ("Interim COO"), Mr. Freeman implemented various cost-cutting initiatives, including, but not limited to, a reduction in force (a layoff of eleven over-head non-billable employees), prioritization of vendors from critical to non-critical, a top to bottom review of all GCE's financials, a reduction in GCE's commercially-based marketing and staff, and a significant reduction in legal expenses. Without these measures GCE would have been unable to meet March's payroll. Mr. Freeman also realized, however, that even with these cost-cutting initiatives in place, coupled with the decrease in market availability of GCE's services, GCE did not have the liquidity to survive on a standalone basis. Further, given the lack of revenue growth, GCE was forced to either diversify its market in a bid to increase revenue,

which in turn would require an increase in capital, or consider a sale of the company as a going

concern or of certain assets to meet the demands of its creditors.

16.    Mr. Freeman thus began the search for an outside investment banker to improve

the prospectus for survival, either through an infusion of capital or through a sale.

C.  **GCE, Through its Investment Banker, Engages in a Vigorous Market Test in an
Attempt to Maximize the Value of its Assets.**

17.    On or about March 16, 2014, GCE engaged Asgaard Capital, LLC ("Asgaard") to

act as its investment banker and to explore sale options for GCE.  At GCE's request, Asgaard

and the Debtor ran a pre-petition sale process, focused on potential buyers including the DOL

and the GSA for the sale of Debtor's assets.

18.    Asgaard and GCE developed a list of potential strategic and financial investors or

purchasers and assisted in soliciting interest among prospective purchasers.  Asgaard

commenced the sale process marketing outreach efforts on behalf of GCE on April 15, 2014.  To

date, 265 parties have been contacted, including 164 "strategic buyers" (*i.e.*, those already

operating and/or competing in the Debtor's industry) and 101 financial sponsors in the sale

process.  As described in greater detail below, the Government, and more specifically the DOL

and the GSA, were included as part of the sale process, and through the two recent awards from

the DOL and GSA, the Government ultimately agreed to purchase substantially all of the

Debtor's intellectual property and transition the Debtor's work force to a new vendor to support

the Government going forward for aggregate cash consideration of approximately $23.5 million.

19.    Asgaard helped the Debtor build a financial model to take to market, which

reflected the management team's go-forward plan and best estimate of the business' potential

within the Debtor's operating constraints.  Additionally, Asgaard helped the Debtor prepare an

information memorandum (with amendments and supplements thereto, the "Sale Memorandum")

and related teaser summary for distribution and presentation to prospective purchasers.

20.    Asgaard helped distribute, negotiate and execute confidentiality agreements with

46 interested prospective purchasers, including both the DOL and the GSA. Asgaard also

assisted the Debtor in organizing and populating an online diligence room. Fourteen (14)

potential purchasers (including the Government), who had executed CAs were given access to

the electronic data room (subject to restrictions on certain sensitive materials for specific

purchasers).

21.    Asgaard helped the Debtor draft the management presentation which was given to

one potential purchaser on June 10, 2014. A management presentation with another party

originally scheduled for Thursday, June 26, 2014 was postponed to allow conclusion of DOL

negotiations for reasons explained in greater detail below.

22.    The Debtor received consistent feedback from many of the strategic parties that

reviewed the acquisition opportunity and ultimately passed based on one or more of the

following factors:

> a.    Size (at $15 million of projected revenue for 2014, too small to consider);
>
> b.    poor strategic fit (outside a given party's acquisition focus area and preferred target criteria);
>
> c.    customer concentration (DOL and EEOC comprise nearly 100% of projected revenue for 2014); and
>
> d.    the federal insourcing mandate and resulting industry challenges/uncertainty facing commercial service providers.

23.     In addition, the current Administration had announced a goal of implementing

Federal shared service provider ("FSSP") agencies to leverage best practices, standardization,

and optimize back-office functions, is currently underway, as issued by the Office of

Management and Budget (policy M-13-08).

24.     In fact, during the sale process, Asgaard Capital and the Debtor attended an

industry day where Asgaard (as well as other industry participants) learned that the initiative was

further along than many thought.  The U.S. Department of Treasury's Financial Innovation and

Transformation ("FIT") is responsible for developing and overseeing the strategy for

implementing M-13-08.  At an FIT industry day on May 21, 2014, the four newly designated

FSSPs presented to an audience of industry participants.  In the presentations, a number of

contractors, many of whom were also part of the Tier I potential buyers who declined to pursue a

transaction with the Debtors, were identified as supporting the different FSSPs, including

Accenture, Deloitte, PwC, BoozAllenHamilton, IBM, SAIC, Kearney & Co., Unisys,

Compusearch and others.  At the industry day, FIT also indicated that while it did expect to

appoint other FSSPs, it did not currently envision adding more than one or two more in the

foreseeable future.

25.     Based on conversations reported by Debtor's management, DOL had chosen not

to be an FSSP and the Debtor does not currently support any of the four existing FSSPs.  Based

on conversations with some of the potential purchasers, and later confirmed by the Debtor, DOL

and the EEOC had also announced intentions to migrate to another FSSP when their contracts

(including government option periods) with the Debtor expired.  As a result, even if the DOJ

Investigation was resolved favorably to the Debtor, it became difficult to foresee how the Debtor

would be able to serve cabinet level agencies or departments.

### D. **Government's Participation in the Sale Process**

26.    The Debtor's Chief Operating Officer initiated discussions with DOL executives early on in the process to apprise them of the sale process Asgaard had initiated with the Debtor in April 2014. The DOL and/or other government agencies were invited to participate in the sale process as well.

27.    By the end of April 2014, DOL and other potentially interested government agency representatives submitted diligence requests to the Debtor, for which Asgaard assisted the Debtor in preparing and providing written responses.

28.    In early May 2014, Asgaard provided a copy of Sale Memorandum and data room access for multiple parties from the Government. Asgaard continued to respond to multiple diligence requests from various parties within the Government. Asgaard also hosted an onsite diligence session at Asgaard's offices with representatives of DOL, GSA and the Debtor.

29.    Following several more weeks of detailed negotiations, the sale process ultimately resulted in two bids from DOL and GSA to purchase substantially all of the Debtor's equipment and intellectual property and transition the Debtor's work force to a new vendor to support the government going forward for aggregate cash consideration of approximately $23.5 million.

30.    Thus, on or about July 21, 2014, DOL issued a draft request for proposal (the "Draft DOL RFP") for the purchase and transfer of the FMS, including the equipment, IP, documentation, and other items necessary to operate DOL's new core financial management system (the "NCFMS"). On July 25, 2014, representatives from GCE and DOL met to discuss the Draft DOL RFP, which resulted in issuance of the final request for proposal (the "Final DOL RFP", and together with the Draft DOL RFP, collectively, the "DOL RFPs") on July 29, 2014. On July 31, 2014, GCE submitted its response to the Final DOL RFP.

31.    Similarly, on or about July 25, 2014, GSA issued a draft request for proposal (the "Draft GSA RFP") for the purchase and transfer of the remaining portion of the FMS to include the equipment, IP, documentation, and other items necessary to operate the NCFMS but not covered under the DOL RFPs.  On July 28, 2014, representatives from GCE and GSA met to discuss the Draft GSA RFP, which resulted in issuance of the final request for proposal (the "Final GSA RFP") on August 1, 2014.  On August 4, 2014, GCE submitted its response to the Final GSA RFP.

32.    On August 18, 2014 and on August 22, 2014, DOL and GSA, respectively, awarded contracts to GCE pursuant to the Final DOL RFP and Final GSA RFP, attached hereto as Exhibits B and C.

    i.    The DOL Contract.

33.    As a result of almost two months of negotiations, on August 18, 2014, GCE and DOL executed that certain amendment of solicitation/modification of contract, modification number 0038 (the "DOL Contract") to GCE's original DOL contract.  Through the DOL Contract, DOL is purchasing certain of GCE's FMS, including but not limited to: various interfaces, licenses, servers, and documentation (collectively, the "DOL Deliverables"), all of which are necessary to operate the NCFMS.  DOL is purchasing the DOL Deliverables for a total purchase price of $5.25 million (the "DOL Purchase Price").  At the end of the DOL Contract, DOL will use the DOL Deliverables for reuse in the successor financial system to support and operate the NCFMS.

34.    In addition, the DOL Contract requires GCE to provide certain transition services to the new operator of the FMS to ensure a seamless transition.  It is imperative GCE execute a seamless transition of the FMS given the core mission specific nature of financial services

contemplated under the DOL Contract and GSA Contract and the Government's fiscal year

ending September 30, 2014. The Assets are critical to Government functioning during the time

leading up to the close of the 2014 fiscal year; disruption in the functioning of the Asset at this

critical time could have a catastrophic impact on the Government. Moreover, due the highly

customized nature of the FMS, the Government determined that, without a successful transition

of certain GCE employees to the new contractor, BoozAllenHamilton ("Booz Allen"), who will

maintain and operate the FMS, transition of the FMS itself, would fail. Indeed, it is a

requirement of the Sale to successfully transition not only the FMS, but also the qualified

employees necessary to run the FMS.

35.    Under the DOL Contract, the DOL Purchase Price is paid in installments upon

GCE's successful delivery of the DOL Deliverables and submission of an invoice to DOL. The

DOL Contract includes the following eight DOL Deliverables: (1) AMS/NCFMS interface; (2)

eTravel/NCFMS interface; (3) eGrants/NCFMS interface; (4) HHS PMS/NCFMS interface; (5)

Payroll interface, (6) commercial software licenses; (7) system documentation, and (8) server

storage of workstation documentation. GCE delivered, and the Government ultimately accepted,

DOL Deliverables one through five and seven through eight. As a result, on August 26, 2014,

GCE received a payment of $3.0 million, and on September 2, 2014, GCE received an additional

$250,000.

36.    GCE, in turn, used the initial $3.25 million payment to pay-off approximately

$300,000 in secured debt and equipment leases, pay its critical vendors current through July,[3]

and settle a number of disputed claims. Shortly after the Petition Date, GCE expects to receive

---

[3]        GCE expects to receive bills from certain vendors related to services rendered in August shortly after the
Petition Date. Those vendors whose services are absolutely necessary to maintain service under the FMS until the
date that GCE completes the delivery of all items set forth in GSA Contract and DOL Contract are subject to an
assignment of their executory contracts and cure payment as set forth herein.

another payment, following delivery of DOL Deliverable item 6, in the amount of $2 million as required under the DOL Contract. GCE used the pre-bankruptcy payments under the DOL Contract as a substitute for debtor in possession financing and will enable the Debtor to have sufficient cash on hand and fund its various administrative obligations as this case proceeds.

    ii.    *The GSA Contract.*

    37.    GSA's authority under the Acquisition Services Fund allows it to purchase equipment for executive branch agencies on a reimbursable basis. On August 21, 2014, GCE and GSA executed that certain solicitation/contract/order for commercial items, contract no. G511Q14BJD0001 (the "GSA Contract"). Through the GSA Contract, GSA will purchase and obtain ownership of those remaining portions of the FMS that are necessary to operate the NCFMS, including equipment, software, IP, ancillary materials, and other deliverables not already procured by DOL under the DOL Contract (collectively, the "GSA Deliverables"). The total purchase price for the GSA Deliverables is $18.25 million (the "GSA Purchase Price").

    38.    In contrast to the DOL Contract, the GSA Purchase Price will be paid in one lump sum payment upon the satisfaction of the following conditions (collectively, the "Conditions Precedent"): (1) completion of the GSA Deliverables; (2) demonstration that GCE has satisfied any security interests or encumbrances on the equipment or materials that are part of the GSA Deliverables; (3) demonstration that, with a few exceptions, GCE has the legal authority to assign all licenses and IP necessary for the government to legally operate the NCFMS; and, importantly for the purposes of this case; (4) Bankruptcy Court approval of the Sale to ensure that GCE provides the GSA Deliverables free and clear of liens, claims, interests, and encumbrances (the "Bankruptcy Court Approval Requirement").

39.    Pursuant to the GSA Contract, all of the Conditions Precedent must be completed no later than September 20, 2014[4] Those GCE employees who are transitioning to Booz Allen, under the DOL Contract and GSA Contract will terminate their employment with GCE as of September 18, 2014, and begin their work with Booz Allen on September 19, 2014.

40.    Upon completion of the Conditions Precedent, the transition of employees to Booz Allen, and the transfer of ownership of the FMS to the Government, GCE must submit an invoice to GSA in order to receive payment of the Purchase Price. These dates are designed to ensure that GCE will be able to invoice the GSA Purchase Price by September 30, 2014, the last day of the government's 2014 fiscal year and the last day before GCE surrenders its commercial leased space. In order to ensure continued operation of the FMS and to reduce the risk to the Government of disruption during the end of the 2014 fiscal year close-out activities, the Government, GCE, and Booz Allen have agreed to execute all action required under the GSA Contract and DOL Contract on or before September 20, 2014.

41.    Based on this agreed-upon notional timetable for these actions to occur, GCE would be without key staff effectively on September 18, 2014. In addition, GCE would be without leased space to ensure continued operations of the DOL and EEOC systems effectively on September 30, 2014.

42.    In the event that GCE is unable to complete the Conditions Precedent on or before September 20, 2014, the result would have a significant impact on GCE's operations, and as a result, have significant consequences for the core financial functions of both DOL and EEOC, particularly at the end of Fiscal Year 2014. If the Sale is not approved and the FMS is not

---

[4]    Because September 20th is a Saturday, the Bankruptcy Court Approval Requirement must be completed no later than September 18, 2014; however, GCE is requesting a hearing on the Sale be scheduled on September 17, 2014 to facilitate the planned transition date and so that GCE will have sufficient time to invoice the Government for payment of the GSA Purchase Price prior to the close of the Government's 2014 fiscal year.

13

transitioned to the Government under the tight deadlines set out in the GSA Contract and DOL

Contract, the DOL and EEOC will each lose the basic automated capability to manage their

finances, creating disastrous effects to those federal agencies and the public they serve for an

unknown and potentially long period of time.

**E.   Summary of the Principal Terms of the DOL Contract and the GSA Contract.**[5]

43.     The principal terms and conditions of the DOL Contract and the GSA Contract

are as follows:

(i)     **The Sale Assets.**  GCE's assets that are the subject of the Sale (the "Sale Assets")
include GCE's FMS, including but not limited to, the equipment, software,
intellectual property, ancillary property, interfaces, licenses, servers, and
documentation necessary to run the FMS and operate the NCFMS. *See* GSA
Contract at §§ 1.1, 2.1-2.2.3, and Attachment; DOL Contract at §§ B, Sch. A to
the DOL-GCE Intellectual Property Assignment Agreement, and Sch. B to the
DOL-GCE Assignment of Intellectual Property Licenses.

(ii)    **Purchase Price.**  The total purchase price for the Sale of the Sale Assets
including the GSA Purchase Price and the DOL Purchase Price (collectively, the
"Purchase Price") is $23,500,000.00. *See* GSA Contract at § 1.3; DOL Contract
at § B.

(iii)   **No Termination/Break-Up Fee.**  Neither the DOL Contract nor the GSA
Contract contemplates a termination or break-up fee.

(iv)    **No Releases.** Neither the DOL Contract nor the GSA Contract includes releases
of the Debtor, its employees, or non-debtor parties.

(v)     **Continued Responsibility to Operate FMS.**  GSE is under a continuing
obligation to operate and maintain the FMS pending the turnover of the Sale
Assets to the Government. *See* GSA Contract at § 2.2; DOL Contract at § A.

(vi)    **Assignment of Licenses and Agreements Necessary to the Operation of the
FMS and the NCFMS.**  GSE is required to notify all software licensors and
vendors providing warranty to, support of, or maintenance of NCFMS Property
(as defined in the GSA Contract) or the FMS in writing that GCE is assigning all
licenses and agreements necessary to operate the NCFMS and the FMS
(collectively, the "Assigned Contracts") to the Government and actually assign
those Assigned Contracts. *See* GSA Contract at §§ 2.2.1.2; 2.2.1.5; DOL

---

[5]     To the extent there are any inconsistencies between the summary description contained herein and the
terms and conditions of the DOL Contract and the GSA Contract, the terms of those contracts control.

Contract at § B; Sch. A to the DOL-GCE Intellectual Property Assignment Agreement, and Sch. B to the DOL-GCE Assignment of Intellectual Property Licenses.

(vii)  **Satisfaction of Liens.** GCE is required to satisfy all liens, claims, encumbrances, and interests of any kind, nature or description (collectively, the "Liens") on the NCFMS Property (as defined in the GSA Contract) and provide evidence to the Government. *See* GSA Contract at § 2.2.2.4.

(viii) **Conditions Precedent to the Funding of the GSA Purchase Price.** The GSA Purchase Price will be paid in one lump sum payment upon the satisfaction of the Conditions Precedent: (1) completion of the GSA Deliverables; (2) demonstration that GCE has satisfied any Liens on the equipment or materials that are part of the GSA Deliverables; (3) demonstration that, with a few exceptions, GCE has the legal authority to assign the Assigned Contracts; and, importantly for the purposes of this case; and (4) Bankruptcy Court approval of the Sale to ensure that GCE provides the GSA Deliverables free and clear of all Liens. *See* GSA Contract at § 1.3.

(ix)  **Schedule of Performance.** Delivery of the all items required under the GSA Contract, including the Assigned Contracts and the Sale Assets, must be completed by no later than **September 20, 2014**. *See* GSA Contract at § 2.3.2.

## III.    REQUEST FOR RELIEF

44.    By this Motion, the Debtor requests the entry of an order substantially in the form attached hereto as <u>Exhibit D</u> (the "Sale Order") (a) authorizing the Sale of the Sale Assets and the assumption and assignment of the Assigned Contracts (defined below) pursuant to sections 105(a), 363(b), and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and 9014, and Local Bankruptcy Rules 2002-1 and 6004-1 and under the terms and conditions set forth in the DOL Contract and the GSA Contract to the Government, free and clear of any and all Liens, (b) waiving the stay imposed by Bankruptcy Rules 6004(h) and 6006(d), and (c) granting such other and further relief as the Court may deem appropriate under the circumstances.

45.    Further, as set forth in the Debtor's Motion (I) For Expedited Hearing Pursuant to Local Rule 9013-1(N) on Debtor's Sale Motion, (II) to Set Deadlines Consistent with Expedited Hearing, and (III) Approve Form of Notice of Expedited Hearing and Deadlines (the "Motion to

Expedite"), filed contemporaneously herewith, the Debtor requests that this Court (a) schedule a hearing on the Motion (the "Sale Hearing") on an expedited basis, (b) approve the form of notice of (i) the Sale Hearing that will be distributed to all creditors and parties in interest in this case, and (ii) the notice assumption/assignment of the Assigned Contracts and proposed cure amounts that will be distributed to the affected non-debtor parties, and (c) set the deadlines for objection to the Sale and/or assumption/assignment of the Assigned Contracts.

46.    Because the relief requested in the Motion contemplates a private sale of the Sale Assets due to the extensive pre-petition marketing efforts of the Debtor, the Debtor is not seeking approval of bidding and auction procedures.

## IV.    BASIS FOR RELIEF REQUESTED

### A.    Approval of the Sale under Bankruptcy Code Sections 363(b) and 105(a) is Warranted.

47.    Section 363(b) of the Bankruptcy Code provides, in relevant part, "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1); *see also* 11 U.S.C. § 1107(a) (providing that debtors in possession have "all the rights . . . of a trustee"). In addition, section 105(a) provides the authority for the Court to carry out the provisions of section 363(b). *See* 11 U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title").

48.    Although section 363(b) does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of the estate, bankruptcy courts routinely authorize sales of a debtor's assets if the sale is based upon the sound business judgment of the debtor. *See In re Dura Auto. Sys.*, 2007 Bankr. LEXIS, at *258 (citing *Myers v Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996)); *Comm. of Equity Sec. Holders v Lionel*

*Corp, (In re Lionel Corp)*, 722 F.2d 106.3, 1070 (2d Cir. 1983); *In re Abbotts Dairies of Penn.,*

*Inc.*, 788 F.2d 143 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of

*Lionel Corp.* and requiring good faith); *In re Delaware and Hudson Ry Co.*, 124 B.R. 169 (D.

Del.. 1991) (concluding that the Third Circuit adopted the "sound business judgment" test in the

*Abbotts Dairies* decision); *In re Montgomery Ward Holding Corp.*, 242 B.R 147, 15.3 (D. Del.

1999) (same).

49.     Courts in the Fourth Circuit have formally adopted the business purpose or

judgment test in the context of asset sales outside of the ordinary course of business. *See, e.g., In*

*re Taylor*, 198 B.R. 142, 157 (Bankr. D.S.C. 1996) (adopting the business purpose test); *In re*

*The Lady H. Coal Co., Inc.*, 193 B.R. 233, 234 (Bankr. S.D. W.Va. 1996) (same); *In re WBQ*

*P'ship*, 189 B.R. 97, 102 (Bankr. E.D. Va. 1995) (same).

50.     When a valid business judgment exists, the law vests the debtor's decision to sell

assets with a strong presumption that "in making a business decision, the directors of a

corporation acted on an informed basis, in good faith, and in honest belief that the action taken

was in the best interests of the company." *In re Dura Auto. Sys*, 2007 Bankr. LEXIS at *260

(citing *The Official Comm. of Subordinated Bondholders y Integrated Res., Inc. (In re Integrated*

*Res, Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992)).  Once a court is satisfied there is a sound

business judgment for the proposed sale, the court must then determine whether (i) the debtor in

possession has provided interested parties with adequate and reasonable notice, (ii) the sale price

is fair and reasonable, and (iii) the purchaser is proceeding in good faith. *See, e g, Del and*

*Hudson Ry. Co.*, 124 B.R. at 166.

### i.    The Sale is a Proper Exercise of the Debtor's Business Judgment.

51.    The Debtor submits that the decision to sell the Sale Assets is based upon its

sound business judgment and should be approved.  Before the Petition Date, the Debtor and its

professionals worked diligently to explore alternatives to sell certain of its business assets in

circumstances like those presented here, where sales would provide maximum value.  For the

reasons noted in detail above and in the Sale Affidavit, those efforts to locate a purchaser

resulted in the firm conclusion that the Sale to the Government is for fair value, and importantly,

provides the Debtor with a buyer ready, willing, and able to close within a timeframe that was

mandated by the Debtor's financial situation.  Therefore, in an exercise of the Debtor's business

judgment, the Debtor dedicated its resources to the most viable option to maximize the value of

its assets—pursuing the Sale to the Government.  The Assets, after all, are unique and tailored to

the Government's processes.

52.    Thus, the Debtor submits that the prompt Sale of the Sale Assets through a private

sale and within the time frames outlined in the GSA Contract and DOL Contract presents the

best opportunity to maximize and preserve the value of its assets for the estate.  Pursuant to

Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by

private sale or by public auction.  Given the facts and circumstances set forth above, in the

Reardon Affidavit, and as will be established at the Sale Hearing, selling the Sale Assets

pursuant to a private sale is appropriate and absolutely necessary under these circumstances and

will maximize the value of the Debtor's estate for creditors, which is the paramount goal in any

proposed sale of property of the estate.  *In re Dura Auto. Sys., Inc.*, 2007 Bankr. LEXIS 2764, at

*253 ("The paramount goal in any proposed sale of property of the estate is to maximize the

proceeds received by the estate.") (citations omitted); *In re WBQ Partnership*, 189 B.R. 97, 104

(Bank. E.D. Va. 1995) (noting that where a public auction would not "command a higher price"

than a private sale, the private sale may better serve the interests of the creditors); *In re Naron &*

*Wagner, Chartered*, 88 B.R. 85, 90 (Bankr. D. Md. 1988) (approving the private sale of a

debtor's business unit because, among other reasons, the business unit being sold was not a

viable business, failure to close the sale quickly and as a going concern would result in a

substantial decrease in the value to the estate, the purchase price substantially exceeded the

estimated liquidation value, and the unit's key personnel threatened to seek other employment if

the sale was not promptly resolved). *See generally Stephens Industries v. McClung*, 789 F.2d

386, 387 (6th Cir. 1986); *In re Medical Software Solutions*, 286 B.R. 431, 435 (Bankr. D. Utah

2002); *In re Industrial Valley Refrigeration and Air Conditioning Supplies, Inc.*, 77 B.R. 15, 17

(Bankr. E.D. Pa. 1987); *In re Brookfield Clothes, Inc.*, 31 B.R. 978, 980 (Bankr. S.D.N.Y. 1983).

53. Put simply, in this case, the Government is the most viable purchaser, given the

sale consideration combined with the speed of pre-sale diligence and certainty of closing the

transaction. The Debtor has proven this to be the case through its extensive pre-bankruptcy

marketing and solicitation efforts. Therefore, given the Debtor's pre-bankruptcy efforts which

have thoroughly tested the market and given that the best offer is from the Government, which

will suffer dire consequences if the transaction does not occur, a private sale without further

auction or bidding procedures is appropriate and necessary.

54. Moreover, like the business unit being sold in *Naron & Wagner*, the FML

(without their sole customer, the Government) are not viable assets for GCE to operate as an

ongoing business, thus, a failure to close the Sale quickly and to sell the Sale Assets as a going

concern would result in a substantial decrease in the value to the estate. Among other things, the

key personnel at GCE who are necessary to maintain the FMS may seek other employment if the

Sale is not promptly approved and transitioned.  Therefore, as in *Naron and Wagner*, approving

the Sale as a private sale under Bankruptcy Rule 6006(f)(1) is not only appropriate under the

circumstances, but it is absolutely necessary.  In addition, the amount of consideration received

under the sale transaction will enable the Debtor to pay a significant, and potentially full,

recovery to creditors in this case.  *See Naron & Wagner*, 88 B.R. at 90 (noting that a private sale

would enable the Debtor to pay its creditors in full and was therefore evidence of good business

judgment).

   *ii.* *The Debtor will Provide Interested Parties with Adequate and Reasonable Notice.*

  55. As set forth below in Section V, the Debtor will provide notice of this Motion by

overnight mail or e-mail delivery to the U.S. Trustee, counsel to the Government, and all non-

debtor parties to the Assigned Contracts.  Further, the Debtor is providing notice of this Motion

via regular mail, postage pre-paid to all remaining creditors and parties in interest in this

bankruptcy case.

  56. Moreover, once this Court rules on the Motion to Expedite, the Debtor will serve

a copy of that order, and its attachments, setting the date and time for the Sale Hearing and the

deadlines for objection to the Sale and/or assumption/assignment of the Assigned Contracts upon

all creditors and parties in interest in this case.  Therefore, all interested parties will have

sufficient time to assert and protect their interests in the Sale Assets.[6]

   *iii.* *The Purchase Price is Fair and Reasonable.*

  57. The total Purchase Price is the product of arm's length negotiations with the

Government, will achieve the best result for the estate, and maximize value for all constituents.

---

[6] Refer to Schedule II, Attachment A of the proposed order granting the Motion to Expedite for a complete list of
contracts the Debtor intends to assume and assign to the Government.

Thus, the Debtor submits the Purchase Price is fair and reasonable, and ultimately will fund a plan and maximize the recovery to creditors in this case.

     *iv.*    *The Government is Proceeding in Good Faith.*

58.    The Sale was intensely negotiated at arm's length. All parties involved acted in good faith and were represented by competent counsel. The Debtor is unaware of any facts or circumstances that might compromise or taint the Government's good faith in negotiating and entering into the DOL Contract or the GSA Contract. Accordingly, the Debtor submits that the Government has acted in good faith.

**B.**    <u>**Sale of the Sale Assets Free and Clear of Liens is Warranted**</u>.

59.    Under section 363(f) of the Bankruptcy Code, a debtor in possession may sell property "free and clear of any interest in such property of an entity other than the estate" if any of the following conditions are satisfied:

    (1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;

    (2)    such entity consents;

    (3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

    (4)    such interest is in bona fide dispute; or

    (5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

60.    The Debtor believes that one or more of these tests in section 363(f) of the Bankruptcy Code are easily satisfied with respect to the Sale of the Sale Assets. First, to the best of the Debtor's knowledge and understanding, the Sale Assets are no longer unencumbered by any recorded Lien and the Debtor has no secured creditors because the Debtor used the pre-

bankruptcy payments to satisfy any Liens on the Sale Assets, which totaled approximately

$300,000. Second, to the extent there is any other unrecorded "interest" in the Sale Assets other

than the Debtor's, the Debtor submits that subsection 363(f)(5) would apply to permit the Sale

free and clear of such interest. The Debtor believes the rights of any claimant could be valued

and allowed as a claim against the Debtor's estate, and thus the claimant could be compelled to

accept a money satisfaction of its interest in property, and section 363(f)(5) would be satisfied.

*In re Trans World Airlines, Inc.*, 322 F.3d 283, 289, 291 (3d Cir. 2003) (holding that section

363(f)(5) was satisfied in respect of successor liability claims because "[h]ad TWA liquidated its

assets under Chapter 7 of the Bankruptcy Code, the claims at issue would have been converted to

dollar amounts and the claimants would have received the distribution provided to other general

unsecured creditors on account of their claims").

61.    Because the section 363(f) requirements have been met and because the delivery

of the Sale Assets free and clear of any Liens is an essential component to the Sale, the

Government should not be liable, as a successor to the Sale Assets or otherwise, for any of the

Debtor's pre-petition liabilities. Therefore, as a buyer of the Debtor's assets pursuant to sections

363(b) or 363(f), the Government is entitled to a finding that it takes the Sale Assets free from

successor liability resulting from any pre-existing claims. *See, e.g., In re Trans World Airlines,*

*Inc.*, 2001 WL 1820325, at *5 (Bankr. D. Del. Mar. 27, 2001) ("Authorizing the sale [of debtor's

assets] free and clear of . . . successor liability claims achieves the purpose of [Bankruptcy Code]

section 363 intended by Congress"), *aff'd*, 332 F.3d 283, 285 (3d Cir. 2003) ("Because section

363(f) of the Bankruptcy Code permits a sale of property 'free and clear' of an 'interest in such

property' and because the claims against TWA here were connected to or arise from the assets

sold, we affirm the Bankruptcy Court's order approving the sale 'free and clear' of successor liability").

**C.      Assumption and Assignment of the Assigned Contracts.**

62.    Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to Court approval, provided the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. *See* 11 U.S.C, § 365. The standard applied by court in determining whether an executory contract or unexpired lease may be assumed is the debtor's "business judgment" that the assumption is in its economic best interests. *See, e.g., Sharon Steel Corp v Nat'l Fuel Gas Distrib. Corp* , 872 F.2d 36, 40 (3d Cir. 1989); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 52.3 (1984) (describing the business judgment test as "traditional").

63.    As a necessary component of the Sale, the Government has required the assignment of the Assigned Contracts. The Debtor believes it can demonstrate at the Sale Hearing that all requirements for assumption and/or assignment of the Assigned Contracts will be satisfied to the extent the parties to the Assigned Contracts have not already consented to such assignment as of the filing of this Motion. Indeed, non-debtor consent to the assignment and assumption of the Assigned Contracts is an essential term of the Sale. *See* GSA Contract at §§ 2.2.1.2; 2.2.1.5; DOL Contract at § B, Sch. A to the DOL-GCE Intellectual Property Assignment Agreement, and Sch. B to the DOL-GCE Assignment of Intellectual Property Licenses.

64.    Further, the Debtor has evaluated the financial wherewithal of the Government and, in exercising its sound business judgment, believes that selling the Sale Assets, and assuming and assigning the Assigned Contracts, to the Government would be in the best interests of the Debtor's estate. Moreover, each non-debtor party to the Assigned Contracts will receive

notice of the proposed assumption and assignment, and the proposed cure amount, and have a

reasonable opportunity to object thereto.

**D.**     **Finding of Good Faith is Warranted.**

65.     Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property does not
> affect the validity of a sale or lease under such authorization to an entity
> that purchased or leased such property in good faith, whether or not such
> entity knew of the pendency of the appeal, unless such authorization and
> such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).  While the Bankruptcy Code does not define "good faith," the Seventh

Circuit in *In re Andy Frain Serv., Inc.*, held:

> The requirement that a purchaser act in good faith . . . speaks to the
> integrity of his conduct in the course of the sale proceedings.  Typically,
> the misconduct that would destroy a purchaser's good faith status at a
> judicial sale involves fraud, collusion between the purchaser and other
> bidders or the trustee, or an attempt to take grossly unfair advantage of
> other bidders.

798 F.2d 1113, 1125 (7th Cir. 1986) (emphasis and citations omitted).

66.     The Sale was intensely negotiated at arm's length:  All parties involved acted in

good faith and were represented by competent counsel.  The Debtor is unaware of any facts or

circumstances that might compromise or taint the Government's good faith in negotiating and

entering into the Sale.  Accordingly, the Debtor requests that the Court determine that the

Government has acted in good faith and is entitled to the protections of a good faith purchaser

under section 363(m) of the Bankruptcy Code.

**E.**     **Relief from Fourteen-Day Waiting Period is Warranted.**

67.     The Debtor requests that the Court waive the fourteen-day stay period under

Bankruptcy Rules 6004(h) and 6006(d) and order that, if and when entered, the Sale Order be

effective immediately to allow the parties to immediately close the Sale.  Bankruptcy Rule

6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen days after entry of the order, unless the court orders otherwise." Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."

68.     The purpose of these rules is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Bankruptcy Rules 6004(h) and 6006(d). Although these rules and the Advisory Committee Notes are silent as to when a court should "order otherwise" and waive the fourteen-day stay period, courts have waived the stay period to allow a transaction to close immediately where there has been no objection to the procedure or where the trustee or debtor possessed insufficient funds to continue to maintain the value of the assets. *See, e.g., Hower v. Molding Sys. Eng'g Corp.*, 445 F.3d 935, 938 (7th Cir. 2006) (affirming elimination of the stay where debtor's cash was precariously low, debtor had employees who needed to be paid, and where purchaser provided fund to keep operations ongoing); *Yamaha Motor Corp., USA v. Perry Hollow Mgmt. (In re Perry Hollow Mgmt)*, 297 F.3d 34, 41 (1st Cir. 2002) (affirming bankruptcy court's decision to waive stay where evidence established sale price was reasonable, buyer was ready to complete the sale the next day, and the estate would impose a storage fee if there was a delay); *In re Daufuskie Island Props., LLC*, 431 B.R. 626, 638-39, 649 (Bankr. D.S.C. 2010) (waiving the stay imposed by Bankruptcy Rules 6004(h) and 6006(d) where trustee's funds to maintain the estate would be exhausted in short course and failure to maintain the property would result in a shutdown of estate assets resulting in the loss of substantial value).

69.    Similar to the situation in *Hower, Perry Hollow Management*, and *Daufuskie Island Properties*, waiver of the stay period imposed by Bankruptcy Rules 6004(h) and 6006(d) is appropriate here due to the following reasons:  (i) the Debtor's cash will likely be insufficient to fund ongoing maintenance of the FMS and the costs of this case beyond September 30, 2014, (ii) failure to maintain the FMS due to insignificant cash flow would result in significant loss of value for the estate and likely result in a liquidation of the Sale Assets for a *de minimis* value, (iii) the Purchase Price is reasonable, (iv) the buyer is ready to complete the Sale, and indeed has conditioned the Sale upon immediate delivery of the Sale Assets by September 20, 2014, and (v) the estate will incur significant additional fees related to the maintenance of the FMS and employment of key GCE personnel who are needed to maintain and service the FMS if the Sale is not approved by September 19, 2014.  Therefore, the Debtor submits that this Court has ample reason to waive the stay under Bankruptcy Rules 6004(h) and 6006(d).

**F.**    **No Previous Request.**

70.    No previous request for the relief sought herein has been made by the Debtor to this or any other court.

### V.    NOTICE

71.    No trustee, examiner, or official committee of unsecured creditors has been appointed in this chapter 11 case.  Notice of this Motion has been provided by overnight delivery or e-mail to (i) the U.S. Trustee, (ii) counsel to the Government, and (iii) all non-debtor parties to the Assigned Contracts.

72.    Notice of this Motion has been provided by regular mail, postage pre-paid to all remaining creditors and parties in interest in this bankruptcy case.  The Debtor submits that no other or further notice need be provided.

73.     WHEREFORE the Debtor respectfully requests the entry of an order, substantially in the form attached hereto as Exhibit D, (i) approving the Sale of Assets to the Government, (ii) waiving the fourteen day stay period contemplated by Bankruptcy Rule 6004(h) and 6006(d), and (iii) granting such other and further relief as the Court may deem just and appropriate.

Dated: September 5, 2014
Tysons Corner, Virginia

McGUIREWOODS LLP

/s/ David I. Swan
David I. Swan (VSB No. 75632)
Kathryn Z. Keane (*pro hac vice forthcoming*)
1750 Tysons Boulevard
Suite 1800
Tysons Corner, VA 22102-4215
Telephone: (703) 712-5365
Facsimile: (703) 712-5246

*Counsel for Global Computer Enterprises, Inc.*

59914419_5