**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| **In re:** | ) |
| | ) |
| **GLOBAL COMPUTER ENTERPRISES,** | ) **Case No. 14- 13290-RGM** |
| **INC.,**[1] | ) |
| | ) **Chapter 11** |
| **Debtor.** | ) |
| | ) |

### DECLARATION OF MICHAEL FREEMAN IN SUPPORT OF
### FIRST DAY PLEADINGS

      1.      I am the Interim Chief Operating Officer (the "Interim COO") of Global

Computer Enterprises, Inc. ("GCE" or the "Debtor"). After experiencing severe financial and

operational distress, as explained in detail in Sections II and III below, Debtor's management

hired me on January 17, 2014, to assist the Debtor with exploring options to maximize the value

of its business, including a potential restructuring and/or sale of the Debtor's business and assets.

The Debtor hired me due to my unique blend of experience assisting large and small companies

navigate United States federal government contracting and IP matters. My specific relevant

experience includes turnaround initiatives at Northrop Grumman Corporation, Hewlett Packard

Company, and several small companies, including Project Performance Corporation, Compath,

KEI, Luciad, as well as several other smaller engagements.

---

[1]     The last four digits of the Debtor's taxpayer identification number are 1136. The mailing address for the
Debtor is 10780 Parkridge Boulevard, Suite 300, Reston, Virginia 20191.

2.      My technical background includes consulting, professional services, operations and software application development.  I was a Chief Technology Officer at Northrop Grumman Corporation, a $35 billion firm, for over 3 years, which enables me to provide a differentiator in turnaround services for technology-based companies.  I have also been intimately involved in technical and management capacities in numerous mergers and acquisitions exceeding $3 billion in total value. I have served on numerous domestic and international board of directors, including for European Union based entities.  I have taught Hewlett Packard Company's course entitled "Maximizing Profit and Revenues" internationally and have been a guest speaker at the National Research Council.

3.      Additionally, I have a M.S. in Technology Management from the University of Maryland and a B.S. in Business Management from the University of LaVerne in California.  I am also a graduate of University of Virginia Darden School of Business's executive leadership training program and The University of Pennsylvania Wharton School's "Executive Business and Finance" series.

4.      On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Virginia (the "Court"), as well as certain motions and other pleadings (collectively, the "First Day Pleadings").  The First Day Pleadings require immediate consideration and relief from this Court given the extremely time-sensitive nature of this case.  The Debtor authorized me to submit this declaration on the Debtor's behalf in support of the First Day Pleadings (the "First Day Declaration").

2

5.    The First Day Pleadings are intended to enable the Debtor to operate efficiently and enter chapter 11 seamlessly so that the Debtor may complete a sale of substantially all of its operating assets (the "Sale") to the United States Department of Labor ("DOL") and the United States General Services Administration ("GSA", together with DOL, collectively, the "Government") prior to the end of the Government's 2014 fiscal year, September 30, 2014. As set forth in significant detail below and in the accompanying motion to approve the Sale, the Debtor engaged in a robust marketing and sale process prior to bankruptcy. After an extensive test of the market, the Sale to the Government represents the highest and best (and only) offer for the Debtor's assets. The Debtor expects that the Sale will yield a healthy recovery for creditors, recognizing that recovery is entirely dependent upon the resolution of certain contingent claims and the Debtor's ability to confirm a plan of liquidation.

6.    With this in mind, the First Day Pleadings seek relief aimed at maintaining the confidence and morale of the Debtor's employees so that they will remain incentivized to complete the Herculean efforts necessary for approval of the Sale and the transition required by the Sale within the tight timeframe provided.

7.    I have reviewed the First Day Pleadings, and it is my belief that the relief sought herein is vital to avoid immediate, serious, and irreparable harm to, and ensure the uninterrupted operation of, the Debtor's business so that the Debtor may meet the unchangeable deadlines for approval of the Sale before the end of the 2014 fiscal year.

8.    In my capacity as the Debtor's Interim COO, I am familiar with the Debtor's day-to-day operations, financial condition, business affairs, books and records, the facts and circumstances that caused the liquidity events that necessitated this bankruptcy filing, and the efforts to which the Debtor and its employees have gone to maximize the value of the Debtor's

assets for creditors, vendors, and other stakeholders.  Except as otherwise indicated, all facts set

forth in the First Day Declaration are based upon:  (a) my personal knowledge; (b) my review of

relevant documents; (c) information supplied to me by other members of the Debtor's

management team or the Debtor's professionals; (d) my knowledge of the federal government

contracting market and dynamics; or (e) my opinion based upon my experience and knowledge

of the Debtor's operations and financial condition.  If called upon to testify at a hearing on the

First Day Pleadings, I would testify competently and truthfully to the facts set forth herein.

## I.        OVERVIEW OF DEBTOR'S BUSINESS

### A.  Brief Overview of the Company's Operations.

9.        GCE, a Maryland corporation with its primary operations in Reston, Virginia, is a

leading cloud-based "software as a service" provider, commonly referred to as a "SAAS" in the

industry, offering financial management solutions (collectively, the "FMS") primarily to

executive departments of the federal government and independent federal government agencies,

including DOL and the Equal Employment Opportunity Commission ("EEOC").  Through the

FMS, GCE provides technical and functional enterprise system solutions, implementation,

transaction processing, financial reporting, and customer support services for federal agencies

seeking compliance and audit support for their financial, accounting, procurement, budget,

travel, and asset management needs.

10.        GCE's FMS is cloud-based and delivered as a service, which enables customers

to avoid the cost of maintaining and managing an on premise IT infrastructure.  GCE's

customers have unlimited, secure access to GCE's FMS, which are fully built out and are

powered by Oracle's eBusiness Suite.  The FMS is composed of highly customized, commercial-

based intellectual property ("IP") software including customized hardware and commercially

available third-party software. Within the market, the FMS is referred to as a commercial shared service provider or "CSSP".

11.    As part of its comprehensive FMS, GCE transitions customers' operations and users quickly and easily to GCE's cloud and provides a customer care team to meet each customer's specific technology and financial needs. GCE manages the entire IT function for its customers and automatically performs updates to ensure its customers' systems remain state-of-the-art. This approach enables customers to focus on managing their businesses and day-to-day financial and accounting operations. GCE continually ensures that the system and service offerings evolve with the changing requirements, regulations, standards, and technologies in the markets in which it operates. Also, GCE offers a flexible pricing model and a full set of services so that customers pay for only those services that they utilize.

12.    Importantly, given the increasing threat of data breaches and ever-evolving cybersecurity issues, GCE is committed to maintaining the integrity, confidentiality, and availability of customers' sensitive financial data. To that end, GCE utilizes a comprehensive, four-pronged data security program based upon NIST standards.[2] As part of its approach, GCE's dedicated security team continuously monitors GCE's networks and systems and performs life-cycle risk activities to deter and correct system vulnerabilities.

13.    The FMS competes with four other federal shared service providers ("FSSPs") within four different service centers all of whom essentially provide the same service to the same set of customers—the United States government's departments and agencies. GCE's FMS, as a CSSP, is the only commercially-based alternative to the federal FSSPs.

---

[2]      NIST, or the National Institute of Standards and Technology, is the federal technology agency that works with various industries to develop and apply technology, measurements, and standards. Recently, under Presidential mandate, the Administration charged NIST with the task of working with stakeholders in the cybersecurity arena to develop and implement a framework for reducing cyber risks to critical government and private infrastructure.

### B. **Company History.**

14.    GCE has been an established leader in the federal procurement and financial

management communities for more than a decade.  Founded in 1988 by its Chief Executive

Officer, Ray Muslimani, GCE first built enterprise financial management systems for the United

States Coast Guard and the Transportation Security Administration.  During this time, GCE also

completed numerous, sizable system integrations for the Department of Homeland Security, the

United States Secret Service, and the Domestic Nuclear Detection Office.

15.    Between 2004 and 2008, GCE provided solutions to the Department of

Commerce by implementing a vendor management system that integrated the e-procurement

system data into the Department's financial and procurement system.  In the same time period,

GCE also provided financial management and audit support to the United States Department of

Transportation and the Federal Aviation Administration.

16.    In 2009, GCE recognized that technology services were shifting to the cloud-

based service model and invested in resources necessary to build out the FMS.  GCE welcomed

its first customer, DOL, to the FMS in January 2010.  In October 2011, the EEOC transitioned to

the FMS from the Department of the Interior's IBC Momentum-based financial service.

### C. **GCE's Facilities and Employees.**

17.    GCE's facilities include corporate headquarters in Reston, Virginia, an onsite

development and testing center in Asburn, Virginia, a primary production data center facility in

Sterling, Virginia, and a disaster recovery data center facility in Highland Ranch, Colorado.  The

three data centers are provided by leading edge commercial providers that host GCE's

proprietary FMS system.

18.    At its height in July 2013, GCE employed one hundred twenty-five employees,

consisting of one hundred sixteen full-time employees and nine contractors.  As a result of the

stress, both financial and personal, caused by the DOJ Investigation (defined below), GCE's total

headcount steadily decreased beginning in November 2013.  As of the Petition Date, GCE

employs sixty-one full-time employees, seven contractors, and one full-time consultant.

### D. **GCE's Key Current Customers.**

19.    Nearly one hundred percent of GCE's revenues are derived from its relationship

with DOL and the EEOC.  For example, DOL utilizes the FMS to standardize and process over

$170 billion worth of transactions a year for its fourteen agencies, eight finance centers, and

1,900+ users nationwide.

20.    GCE maintains an authority to operate (an "ATO") with DOL and EEOC,

effectively positioning the company as an outsourced CSSP.  Both ATOs were renewed in

September 2012 for a three-year term.  DOL and EEOC awarded the ATOs to GCE as the prime

contractor through a full and open procurement basis.  The ATOs are essential to GCE's ability

to work with the federal government and related agencies.

II.    **EVENTS LEADING TO THE COMMENCEMENT OF THIS CASE AND
DEBTOR'S CHAPTER 11 PLAN AND STRATEGY**

21.    Historically, GCE enjoyed a certain level of profitability, including total revenue

of $24.1 million and EBITDA of $3.2 million in 2010, and total revenue of $28.7 million and

EBITDA of $5.1 million in 2011.  In 2013, however, GCE's facilities were raided by the FBI

and other agencies of the federal government, which was followed by an investigation by the

Department of Justice related to GCE's alleged violation  and use of foreign nationals

performing under contracts where prohibited (the "DOJ Investigation").  GCE opposes any civil

or criminal penalties that the DOJ may pursue, but GCE has been cooperating with the DOJ

Investigation and engaging in efforts to resolve the DOJ's contingent claims.

22.    Unfortunately, the DOJ Investigation, and the distractions and costs suffered by

GCE as a result thereof, drained GCE's management, business operations, and ultimately, cash.

GCE was not only forced to defend itself, but also undertook the support of the costs of

defending individual members of management.  GCE incurred approximately $4.67 million in

legal bills and related expenses resulting from the DOJ Investigation, quickly exhausting its

D&O insurance policy, and eliminating all profitability and liquidity of the Debtor.

III.    **DEBTOR'S ATTEMPTS TO PROCURE STRATEGIC FINANCING OR
ENGAGE IN A SALE OF ITS ASSETS PRE-BANKRUPTCY**

A.    **GCE Hires Michael Freeman as Interim COO in an Effort to Survive the
Immediate Crisis.**

23.    In January 2014, I was hired by GCE to address the various issues with GCE's

business operations.  I quickly realized that GCE did not have enough cash to pay its mounting

legal bills and maintain business operations, including payroll.  I implemented various cost-

cutting initiatives, including, but not limited to, a reduction in force (a layoff of eleven over-head

non-billable employees), prioritization of vendors from critical to non-critical, a top to bottom

review of all GCE's financials, a reduction in GCE's commercially-based marketing and staff, and a significant reduction in legal expenses. Without these measures GCE would have been unable to meet March's payroll.

24.     I also realized, however, that even with these cost-cutting initiatives in place, coupled with the decrease in market availability of GCE's services (as discussed below), GCE did not have the liquidity to survive on a standalone basis. Further, given the lack of revenue growth, GCE was forced to either diversity its market in a bid to increase revenue, which in turn would require an increase in capital, or consider a sale of the company as a going concern or of certain assets to meet the demands of its creditors.

25.     I thus began the search for an outside investment banker to improve the prospectus for survival, either through an infusion of capital or through a sale of GCE as a going concern or a piecemeal sale of its assets. At the same time, February 2014, I began to solicit and engage the Government in discussions regarding the Government's potential purchase of the FMS. During this time, GCE generated a number of white papers[3] for the Government and participated in a number of meetings with Government representatives regarding the cost benefit to the Government of directly purchasing the FMS. Early in this process, the Government expressed interest in purchasing the FMS primarily to reduce the overall risk of a gap in the DOL's and EEOC's core and mission-critical financial and accounting services.

**B.   GCE, Through its Investment Banker, Engages in a Vigorous Market Test in an Attempt to Maximize the Value of its Assets.**

26.     In early March 2014, GCE's management chose to seek out potential investment bankers to explore GCE's options for either a stock sale or an asset sale. After interviewing seven investment banks and receiving three subsequent proposals, GCE chose Asgaard Capital,

---

[3]      A white paper is an authoritative report or guide helping readers understand an issue, solve a problem, or make a decision.

LLC ("Asgaard") because Asgaard provided the highest likely outcome of a successful sale. On or about March 16, GCE engaged Asgaard to act as its investment banker and to explore a broad range of strategic financing and sale options for GCE. In furtherance of this two-pronged approach to maximize the value of the Debtor, Asgaard prepared a teaser that described GCE on a confidential basis (*i.e.* without disclosing GCE's identity), including its operations, historical financial data, and assets (the "Teaser"). At the same time, Asgaard explored accounts receivable financing options with various financial institutions and factors, but determined that factoring was either impossible to leverage properly or too expensive to afford.

27.    According to Asgaard, the Teaser was distributed to 164 potential strategic buyers whose operations touched on some aspect of GCE's business or who had expressed an interest in expanding into the CSSP or SAAS markets (collectively, the "Potential Purchasers") and 101 potential financial sponsors whose financial portfolio included investments in similarly situated companies or who had expressed interest in expanding their portfolios (collectively, the "Potential Investors").

28.    Thirty-one of the Potential Investors executed a confidentiality agreement with GCE and were subsequently given access to a confidential information memorandum (the "CIM") prepared by Asgaard, which described GCE and its operations and finances in significant detail, and/or a data room comprised of, among other things, GCE's financials and contracts (the "Data Room"). After reviewing the CIM and/or Data Room, none of the Potential Investors elected to move forward with a management presentation and Asgaard received no financing or investing proposals.

29.    At the same time, only eight of the Potential Purchasers chose to execute a confidentiality agreement with GCE and were given access to the CIM and/or Data Room. Of

those eight, one Potential Purchaser elected to participate in a presentation with GCE's

management, but ultimately did not submit a proposal to purchase GCE's assets.

30.    Ultimately, the Potential Purchasers and Potential Investors declined to move

forward with a transaction with GCE citing one or more of the following concerns: (1) the

nature of GCE's business did not fit within their investment portfolio or business model and they

were unwilling to expand into the CSSP or SAAS markets; (2) the life of GCE's remaining

contracts with DOL, GSA, and EEOC was too short to ensure a profitable enterprise and may not

be renewed by these government entities; and/or (3) the viability of GCE's remaining contracts

with DOL, GSA, and EEOC was too uncertain given the recent Presidential mandate to promote

"insourcing" or the use of government personnel to perform functions that outside contractors,

like GCE and other contractors, have typically performed on behalf of federal agencies.

31.    In particular, regarding the value of GCE's FMS, Potential Purchasers' and

Potential Investors' seeming lack of interest in purchasing or funding GCE stemmed from the

insourcing initiative promulgated by recent Congresses and the Obama Administration, known as

the Financial Innovation and Transformation or "FIT". The value of GCE's FMS and business

depends in large part on the value of GCE's government contracts, each of which have a finite

and limited amount of time remaining. Because GCE's business model was dependent upon one

major customer—the Government, which was in the process of potentially insourcing the work

under the FIT and which limited the available market for the Debtor's FMS—GCE's integrated

business value in the commercial market diminished significantly.

**C.  GCE's Negotiations with the Government.**

32.    Therefore, in late June 2014, after a thorough test of the market which resulted in

no offers to either purchase or finance GCE and in the face of an ongoing liquidity crisis, GCE

elected to cease further efforts to sell its assets to, or procure investment financing from, private

purchasers. Instead, GCE focused its marketing, sale, and financing efforts to its primary

customer—the federal government.

33.     On or about July 21, 2014, DOL issued a draft request for proposal (the "Draft

DOL RFP") for the purchase and transfer of the FMS, including the equipment, IP,

documentation, and other items necessary to operate DOL's new core financial management

system (the "NCFMS").  On July 25, 2014, representatives from GCE and DOL met to discuss

and tailor the Draft DOL RFP, which resulted in issuance of the final request for proposal (the

"Final DOL RFP", and together with the Draft DOL RFP, collectively, the "DOL RFPs") on July

29, 2014.  On July 31, 2014, GCE submitted its response to the Final DOL RFP.

34.     Similarly, on or about July 25, 2014, GSA issued a draft request for proposal (the

"Draft GSA RFP") for the purchase and transfer of the remaining portion of the FMS to include

the equipment, IP, documentation, and other items necessary to operate the NCFMS but not

covered under the DOL RFPs.  On July 28, 2014, representatives from GCE and GSA met to

discuss and tailor the Draft GSA RFP, which resulted in issuance of the final request for proposal

(the "Final GSA RFP") on August 1, 2014.  On August 4, 2014, GCE submitted its response to

the Final GSA RFP.

35.     On August 18, 2014 and on August 22, 2014, DOL and GSA, respectively,

awarded contracts to GCE pursuant to the Final DOL RFP and Final GSA RFP.

    i.     *The DOL Contract.*

36.     As a result of almost two months of negotiations, on August 18, 2014, GCE and

DOL executed that certain amendment of solicitation/modification of contract, modification

number 0038 (the "DOL Contract") to GCE's original DOL contract.  Through the DOL

Contract, DOL is purchasing certain of GCE's FMS, including but not limited to: various

interfaces, licenses, servers, and documentation (collectively, the "DOL Deliverables"), all of

which are necessary to operate the NCFMS. DOL is purchasing the DOL Deliverables for a total

purchase price of $5.25 million (the "DOL Purchase Price"). At the end of the DOL Contract,

DOL will use the DOL Deliverables for reuse in the successor financial system to support and

operate the NCFMS.

37.     In addition, the DOL Contract requires GCE to provide certain transition services

to the new operator of the FMS to ensure a seamless transition. It is imperative GCE execute a

seamless transition of the FMS given the nature of the DOL Contract and GSA Contract, the core

mission specific nature of financial services contemplated thereunder, under the DOL contract

and GSA contract and the Government's fiscal year ending September 30, 2014. The Assets are

critical to Government functioning during the time leading up to the close of the 2014 fiscal year,

and disruption in the functioning of the Assets at this critical time could have a catastrophic

impact on the Government. Moreover, due the highly customized nature of the FMS, the

Government determined that, without a successful transition of certain GCE employees to the

new contractor, Booz Allen Hamilton ("Booz Allen"), who will maintain and operate the FMS,

transition of the FMS itself, would fail. Indeed, it is a requirement of the Sale to successfully

transition not only the FMS, but also the qualified employees necessary to run the FMS.

38.     Under the DOL Contract, the DOL Purchase Price is paid in installments upon

GCE's successful delivery of the DOL Deliverables and submission of an invoice to DOL. The

DOL Contract includes the following eight DOL Deliverables: (1) AMS/NCFMS interface; (2)

eTravel/NCFMS interface; (3) eGrants/NCFMS interface; (4) HHS PMS/NCFMS interface; (5)

Payroll interface, (6) commercial software licenses; (7) system documentation, and (8) server

storage of workstation documentation. GCE delivered, and the Government ultimately accepted, DOL Deliverables one through five and seven through eight. As a result, on August 26, 2014, GCE received a payment of $3.0 million, and on September 2, 2014, GCE received an additional $250,000.

39.     GCE, in turn, used the initial $3.25 million payment to pay-off approximately $349,240.00 in secured debt and equipment leases, pay its critical vendors current through July, and settle a number of disputed claims. Shortly after the Petition Date, GCE expects to receive another payment, following delivery of DOL Deliverable item 6, in the amount of $2 million as required under the DOL Contract. The payments under the DOL Contract were used to satisfy pre-petition liens against the assets, resolve the Debtor's liquidity issues, and will enable the Debtor to have sufficient cash on hand and fund its various administrative obligations as this case proceeds.

_ii.    The GSA Contract._

40.     GSA's authority under the Acquisition Services Fund allows it to purchase equipment for executive branch agencies on a reimbursement basis. On August 21, 2014, GCE and GSA executed that certain solicitation/contract/order for commercial items, contract no. G511Q14BJD0001 (the "GSA Contract"). Through the GSA Contract, GSA will purchase and obtain ownership of those remaining portions of the FMS that are necessary to operate the NCFMS, including equipment, software, IP, ancillary materials, and other deliverables not already procured by DOL under the DOL Contract (collectively, the "GSA Deliverables"). The total purchase price for the GSA Deliverables is $18.25 million (the "GSA Purchase Price").

41.     In contrast to the DOL Contract, the GSA Purchase Price will be paid in one lump sum payment upon the satisfaction of the following conditions (collectively, the "Conditions

Precedent"): (1) completion of the GSA Deliverables; (2) demonstration that GCE has satisfied

any security interests or encumbrances on the equipment or materials that are part of the GSA

Deliverables; (3) demonstration that, with a few exceptions, GCE has the legal authority to

assign all licenses and IP necessary for the government to legally operate the NCFMS; and,

importantly for the purposes of this case; and (4) Bankruptcy Court approval of the Sale to

ensure that GCE provides the GSA Deliverables free and clear of liens, claims, interests, and

encumbrances (the "Bankruptcy Court Approval Requirement").

42.     Pursuant to the GSA Contract, all of the Conditions Precedent, including the

Bankruptcy Court Approval Requirement, must be completed no later than September 20, 2014[4]

Those GCE employees who are transitioning to Booz Allen, under the DOL Contract and GSA

Contract will terminate their employment with GCE as of September 18, 2014, and be assigned

to work with Booz Allen on September 19, 2014.

43.     Upon completion of the Conditions Precedent, the transition of employees to

Booz Allen, and the transfer of ownership of the FMS to the Government, GCE must submit an

invoice to GSA in order to receive payment of the Purchase Price. These dates are designed to

ensure that GCE will be able to invoice the GSA Purchase Price by September 30, 2014, the last

day of the government's 2014 fiscal year. In order to ensure continued operation of the FMS and

to reduce the risk to the government of disruption during the end of the 2014 fiscal year close-out

activities, the Government, GCE, and Booz Allen have all agreed to execute all action required

under the GSA contract and DOL Contract on or before September 20, 2014.

---

[4]        Because September 20th is a Saturday, the Bankruptcy Court Approval Requirement must be completed no
later than September 18, 2014; however, GCE is requesting a hearing on the Sale be scheduled no later than
September 17, 2014 to facilitate the planned transition date and so that GCE will have sufficient time to invoice the
Government for payment of the GSA Purchase Price prior to the close of the Government's 2014 fiscal year.

**D.  The Employee Incentive Plans.**

44.    In the first quarter of 2014, GCE experienced a significant increase in employee

attrition after a series of layoffs and the continuing strain caused by the DOJ Investigation.

Between January 1, 2014, and March 31, 2014, sixteen employees resigned from GCE, which is

in addition to the eleven employees who were previously laid off.  Because it was absolutely

essential that GCE maintain trained and experienced personnel to deliver the complex and

critical services under the FMS to its customers, GCE put the remaining core group of employees

under employment contracts.  It is imperative to the Government, and thus the timing and

success of the Sale, to transition these highly specialized employees, without which it would be

impossible to operate the FMS.  Given the importance of the employees to the Buyer and GCE to

effectuate the Sale, the Debtor will file a motion to assume and assign these employment

contracts as a non-First Day Pleading.

45.    Separately, the Debtor will file a motion to approve its key employee incentive

plan (the "KEIP"), also as a non-First Day Pleading, but will request that the Court consider the

KEIP for approval at the same time as approval of the Sale.  The KEIP is for the Debtor's five

most critical employees who have been instrumental in preserving and maximizing the value of

the estate and who are vital to ensuring that the highly complex and detailed transition of the

FMS to the Government is successfully completed, that a liquidating plan is confirmed, and that

the bankruptcy case is brought to a successful conclusion.

**E.  The Direction of this Chapter 11 Case.**

46.    If the Sale is approved by September 18, 2014, the Debtor then anticipates

working with its advisors to set a claims bar date, reject any remaining executory contracts,

licenses, and leases that are not being assigned to GSA or DOL, formulate a plan of liquidation,

16

and resolve certain unliquidated and/or disputed claims including those that relate to the DOJ

Investigation. The Debtor has no secured debt, so after the satisfaction of any administrative and

other priority claims and taxes, leftover Sale proceeds will flow down in the waterfall to allowed

claims of general unsecured creditors. For illustrative purposes, attached is a case budget

prepared by the Debtor with the assistance of its professionals.

47.    As a first step toward these various goals and events to achieve a successful case,

the Debtor requires the following relief set forth in the First Day Pleadings.

**IV.    ADDITIONAL FACTS RELEVANT TO THE FIRST DAY PLEADINGS**

48.    Concurrently with the filing of this chapter 11 case, the Debtor filed the First Day

Pleadings, which request various forms of relief. The First Day Pleadings have been designed to

meet the Debtor's goals of: (a) maintaining the confidence and morale of the Debtor's

employees so that they will remain incentivized to help the Debtor meet DOL and GSA's tight

transition period and timeframe to approve the Sale; (b) establishing procedures for the smooth

and efficient administration of this chapter 11 case; and, most importantly, (c) ensuring that the

Debtor is able to meet the established and unchangeable time table to complete the Sale and the

transition required under the DOL Contract and GSA Contract by September 18, 2014, which the

Debtor believes, as supported by a robust market test, is the only way to maximize the value of

its assets for creditors and stakeholders.

49.    Indeed, the Debtor intends to file its Schedules of Assets and Liabilities (the

"Schedules") and Statement of Financial Affairs (the "SOFA") prior to the first day hearing, to

afford creditors and other parties in interest complete and immediate transparency of the assets,

liabilities, and other financial information involved in this case and help secure the confidence of

17

this Court that the Sale to the Government in a shortened time frame is necessary and in the best interest of the estate.

50.     I have reviewed and discussed with Debtor's management team, counsel, and other professional advisors each of the First Day Pleadings filed contemporaneously herewith (including the exhibits thereto and supporting memoranda) and incorporate by reference the factual statements set forth in the First Day Pleadings.  It is my belief that the relief sought in each of the First Day Pleadings is tailored to meet the goals described above and, ultimately, most importantly, will be critical to the Debtor's ability to achieve the Sale on the strict time table detailed above.

**A.  Motion for Expedited Consideration of the Sale Motion.**

51.     As set forth above, in order to ensure continued operation of the FMS and to reduce the risk to the Government of disruption during the end of the 2014 fiscal year close-out activities, the Government, GCE, and Booz Allen have agreed to execute all action required under the GSA Contract and DOL Contract on or before September 20, 2014.  If the Sale is not approved and the FMS is not transitioned to the Government under the tight deadlines set out in the GSA Contract, DOL and EEOC will each lose the basic capability to manage their finances creating disastrous effects to those federal agencies and the public they serve for an unknown and potentially long period of time.

52.     Accordingly, shortening notice so that the Sale Hearing can be heard on or before September 18, 2014, is of critical and necessary importance for the preservation of value for the Debtor's estate and, importantly, for the preservation and operations of DOL's financial management system, NCFMS, which is necessary to the core functions of DOL.

## B. **Employee Wage Motion**.

53.    The Debtor's business depends on the skills and institutional and specialized

knowledge of its employees, and these employees are crucial to the Debtor's operations, the

preservation of value for the benefit of its creditors, and most importantly, for a seamless

completion of the Sale and transition of the Debtor's assets to the Government.

54.    As of the Petition Date, the Debtor employed approximately fifty-eight full time

and 4 part-time full-time and four part-time employees (collectively, the "Employees"). The

Employees are paid every two weeks in arrears and received their last direct deposit or paycheck,

as applicable, on August 29, 2014, covering the period of August 9, 2014 through and including

August 22, 2014. The Debtor's next pay day occurs on September 12, 2014, covering the period

of August 23, 2014 through and including September 5, 2012. Approximately $182,885.00 has

accrued in respect of the pre-petition services rendered by the Employees during the applicable

pre-petition payroll period.

55.    The Debtor also makes payments to certain benefits vendors each month and then

deducts from its Employee's paychecks amounts comprising Employee's contributions to benefit

plans including (a) medical, dental, and vision and prescription drug plans, (b) short- term and

long-term disability insurance, (c) flexible spending accounts, (d) dependent care, (e) basic life

insurance, and (f) COBRA insurance. The Debtor may have accrued certain amounts on account

of its benefits payments that were not yet billed to the Debtor as of the Petition Date. Such

amounts may have been collected as deductions from the Employee's paychecks, but not yet paid

to the benefits providers on account of such benefits. In addition to the above benefits, the

Debtor provides the Employees with certain leave policies and benefits (including sick days,

workers' compensation leave, maternity leave, and floating holidays), some of which are

mandated or encouraged by law and some of which may have pay or benefits components.

56.     The Debtor provides the Employees with the ability to accrue vacation, sick, and

personal leave into a single annual account under the current paid time off ("PTO") policy. PTO

is accrued at a fixed rate every payroll period based on a Employee's years of service. Upon

termination or resignation, Employees with 0-5 years of experience are paid 50% of their PTO

balance, whereas employees with 5+ years of experience are paid 60% of their PTO balance. In

some instances and with prior approval based upon availability, Employees may be entitled to be

paid in cash for the accrued but unused PTO.

57.     The Debtor customarily pays for a variety of the Employee's business-related

expenses incurred in performing their employment obligations (the "Business Expenses").

Employees may sometimes pay Business Expenses out of their own funds. All such expenses

are incurred with the understanding that they will be reimbursed by the Debtor in accordance

with the Debtor's reimbursement policy. In such cases, Employees are reimbursed upon the

submission of a claim itemizing the Business Expenses. Although there is no way to determine

the precise amount of outstanding Business Expenses at any moment in time because expenses

may not have been submitted, the Debtor estimates that approximately one month of Business

Expenses remains outstanding as of the Petition Date, or approximately $1,000.00.

**C. Cash Management Motion.**

58.     The Debtor maintains a cash management and disbursement system in the

ordinary course of its operations (the "Cash Management System"). The Cash Management

System has been used substantially in its current structure for several years as part of the

Debtor's ordinary and customary business practices. It enables the Debtor to effectively and

efficiently collect, transfer, and disburse funds as needed in the Debtor's general business operations. A disruption in the Cash Management System would cause delays in the collection and disbursement of funds, thus impeding the Debtors' ability to carry out its normal business operations.

59.    Under the circumstances, it is in the best interests of the Debtor's estate and creditors that the Cash Management System be maintained. Furthermore, the Debtor's Sale efforts will be facilitated by preserving the "business as usual" atmosphere and avoiding any disruption in the Cash Management System, Checking Accounts, and other business records.


Dated: September 5, 2014                                 /s/ Mike Freeman
Reston, Virginia                                         Michael Freeman
                                                         Interim Chief Operating Officer
                                                         Global Computer Enterprises, Inc.


60003977_2

| GCE Forecast | 1 Sept 5-6 | 2 13-Sep | 3 20-Sep | 4 27-Sep | 5 4-Oct | 6 11-Oct | 7 18-Oct | 8 25-Oct | 9 1-Nov | 10 8-Nov | 11 15-Nov | 12 22-Nov | 13 29-Nov | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CASH RECEIPTS** | | | | | | | | | | | | | | |
| Operating | | 941,804 | | 250,000 | | 739,804 | 70,000 | 125,000 | | | | | | 2,126,609 |
| Asset Sale Proceeds | | | 2,000,000 | | | | 18,250,000 | | | | | | | 20,250,000 |
| **CASH RECEIPTS** | | 941,804 | 2,000,000 | 250,000 | | 739,804 | 18,330,000 | 125,000 | | | | | | 22,376,609 |
| **DISBURSEMENTS** | | | | | | | | | | | | | | |
| Payroll | | 250,000 | | 250,000 | | 125,000 | | 60,000 | | 60,000 | | 30,000 | | 775,000 |
| Vendors | | 77,825 | 81,220 | 23,250 | 171,994 | 48,750 | 82,720 | 13,250 | 14,925 | 43,750 | 45,750 | 13,250 | 13,250 | 629,934 |
| Cure Payments | | | | | | 1,313,140 | | | | | | | | 1,313,140 |
| Rent | | | | 50,000 | | | | | | | | | | 50,000 |
| PTO Payout | | | | | | 188,000 | | | | 30,000 | | 15,000 | | 233,000 |
| Severance | | | | | | 175,000 | | | | 20,000 | | 15,000 | | 210,000 |
| Miscellaneous | | | | | | | | | | | | | | |
| **DISBURSEMENTS** | | 327,825 | 81,220 | 323,250 | 171,994 | 1,849,890 | 82,720 | 73,250 | 14,925 | 153,750 | 45,750 | 73,250 | 13,250 | 3,211,074 |
| **OPERATING CASH FLOW** | | 613,979 | 1,918,780 | (73,250) | (171,994) | (1,110,086) | 18,237,280 | 51,750 | (14,925) | (153,750) | (45,750) | (73,250) | (13,250) | 19,165,535 |
| **RESTRUCTURING** | | | | | | | | | | | | | | |
| McGuireWoods | | | | | | | 202,000 | | | | | 176,000 | | 378,000 |
| Weinsweig/Advisors | | | | | | | 64,600 | | | | | 40,000 | | 104,600 |
| Asgard Capital | | | | | | | | 1,100,000 | | | | | | 1,100,000 |
| Tax Advisor | | | | | | | | | | 20,000 | | | | 20,000 |
| KEIP / Success Fee | | | | | | | | 910,253 | | | | | | 910,253 |
| Postage / Mailings | | | | | 5,000 | | | | 5,000 | | | | | 10,000 |
| Litigation Costs | | | | | | | | 125,000 | | | | 125,000 | | 250,000 |
| Trustee Fees | | | | | | | | | 10,000 | | | | | 10,000 |
| **RESTRUCTURING COSTS** | | | | | 5,000 | | 266,600 | 2,135,253 | 15,000 | 20,000 | | 341,000 | | 2,782,853 |
| **NET CASH FLOW** | | 613,979 | 1,918,780 | (73,250) | (176,994) | (1,110,086) | 17,970,680 | (2,083,503) | (29,925) | (173,750) | (45,750) | (414,250) | (13,250) | 16,382,682 |
| **Cash Balance** | | | | | | | | | | | | | | |
| Beginning | 1,329,635 | 1,329,635 | 1,943,614 | 3,862,394 | 3,789,144 | 3,612,150 | 2,502,065 | 20,472,745 | 18,389,242 | 18,359,317 | 18,185,567 | 18,139,817 | 17,725,567 | 1,329,635 |
| Net Cash Flow | | 613,979 | 1,918,780 | (73,250) | (176,994) | (1,110,086) | 17,970,680 | (2,083,503) | (29,925) | (173,750) | (45,750) | (414,250) | (13,250) | 16,382,682 |
| Ending | 1,329,635 | 1,943,614 | 3,862,394 | 3,789,144 | 3,612,150 | 2,502,065 | 20,472,745 | 18,389,242 | 18,359,317 | 18,185,567 | 18,139,817 | 17,725,567 | 17,712,317 | 17,712,317 |

| GCE | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Forecast | Sept 5-6 | 13-Sep | 20-Sep | 27-Sep | 4-Oct | 11-Oct | 18-Oct | 25-Oct | 1-Nov | 8-Nov | 15-Nov | 22-Nov | 29-Nov | TOTAL |
| **CASH RECEIPTS** | | | | | | | | | | | | | | |
| Operating | | 941,804 | | 250,000 | | 739,804 | 70,000 | 125,000 | | | | | | 2,126,609 |
| Asset Sale Proceeds | | | 2,000,000 | | | | 18,250,000 | | | | | | | 20,250,000 |
| **CASH RECEIPTS** | | 941,804 | 2,000,000 | 250,000 | | 739,804 | 18,320,000 | 125,000 | | | | | | 22,376,609 |
| **DISBURSEMENTS** | | | | | | | | | | | | | | |
| Payroll | | 250,000 | | 250,000 | | 125,000 | | 60,000 | | 60,000 | | 30,000 | | 775,000 |
| Vendors | | 77,825 | 81,220 | 23,250 | 171,994 | 48,750 | 82,720 | 13,250 | 14,925 | 43,750 | 45,750 | 13,250 | 13,250 | 629,934 |
| Cure Payments | | | | | | 1,313,140 | | | | | | | | 1,313,140 |
| Rent | | | | 50,000 | | | | | | | | | | 50,000 |
| PTO Payout | | | | | | 188,000 | | | | 30,000 | | 15,000 | | 233,000 |
| Severance | | | | | | 175,000 | | | | 20,000 | | 15,000 | | 210,000 |
| Miscellaneous | | | | | | | | | | | | | | |
| **DISBURSEMENTS** | | 327,825 | 81,220 | 323,250 | 171,994 | 1,849,890 | 82,720 | 73,250 | 14,925 | 153,750 | 45,750 | 73,250 | 13,250 | 3,211,074 |
| **OPERATING CASH FLOW** | | 613,979 | 1,918,780 | (73,250) | (171,994) | (1,110,086) | 18,237,280 | 51,750 | (14,925) | (153,750) | (45,750) | (73,250) | (13,250) | 19,165,535 |
| **RESTRUCTURING** | | | | | | | | | | | | | | |
| McGuireWoods | | | | | | | 202,000 | | | | | 176,000 | | 378,000 |
| Wehrwein Advisors | | | | | | | 64,600 | | | | | 40,000 | | 104,600 |
| Asgaard Capital | | | | | | | | 1,100,000 | | | | | | 1,100,000 |
| Tax Advisor | | | | | | | | | | 20,000 | | | | 20,000 |
| KEIP / Success Fee | | | | | | | | 910,253 | | | | | | 910,253 |
| Postage / Mailings | | | | | 5,000 | | | | 5,000 | | | | | 10,000 |
| Litigation Costs | | | | | | | | 125,000 | | | | 125,000 | | 250,000 |
| Trustee Fees | | | | | | | | | 10,000 | | | | | 10,000 |
| **RESTRUCTURING COSTS** | | | | | 5,000 | | 266,600 | 2,135,253 | 15,000 | 20,000 | | 341,000 | | 2,782,853 |
| **NET CASH FLOW** | | 613,979 | 1,918,780 | (73,250) | (176,994) | (1,110,086) | 17,970,680 | (2,083,503) | (29,925) | (173,750) | (45,750) | (414,250) | (13,250) | 16,382,682 |
| **Cash Balance** | | | | | | | | | | | | | | |
| Beginning | 1,329,635 | 1,329,635 | 1,943,614 | 3,862,394 | 3,789,144 | 3,612,150 | 2,502,065 | 20,472,745 | 18,389,242 | 18,359,317 | 18,185,567 | 18,139,817 | 17,725,567 | 1,329,635 |
| Net Cash Flow | | 613,979 | 1,918,780 | (73,250) | (176,994) | (1,110,086) | 17,970,680 | (2,083,503) | (29,925) | (173,750) | (45,750) | (414,250) | (13,250) | 16,382,682 |
| Ending | 1,329,635 | 1,943,614 | 3,862,394 | 3,789,144 | 3,612,150 | 2,502,065 | 20,472,745 | 18,389,242 | 18,359,317 | 18,185,567 | 18,139,817 | 17,725,567 | 17,712,317 | 17,712,317 |